**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| **ALICIA SMITH, CAROLINA BOURQUE, EMMA BURKEY, CHRISTOPHER CODY FLINT, MICHELLE ZIMMERMAN, PhD, ERIN RHODES, and JESSICA KROGMEIER, LORIN JEPPSEN, and REACT19, INC** | |
| *Plaintiffs,* | Case No. 3:23-cv-01425 |
| -vs.- | Judge Elizabeth E. Foote |
| **UNITED STATES OF AMERICA, UNITED STATES HEALTH RESOURCES AND SERVICES ADMINISTRATION, UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, and JOHN DOES 1-3,** | Magistrate Kayla D. McClusky |
| *Defendants.* | |

**SECOND AMENDED VERIFIED COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF AND DAMAGES**

1

## INTRODUCTION

1.      This case presents the heartbreaking plights of a cross-section of ordinary Americans who suffered and continue to suffer devastating and debilitating injuries which started within days of receiving a COVID-19 vaccine. While drugmakers reap billions of dollars in profits behind the impenetrable shield of legal immunity, Plaintiffs and their families are left with shattered lives, mounting medical bills, ongoing testing and treatment, and in some cases, permanent disabilities and death. The Court should be aware that for every story told in this case, there are thousands upon thousands more, equally heartbreaking and unjust.

2.      Instead of being able to sue the vaccine manufacturers for their injuries in a court of law, Plaintiffs have been forced by federal statute, the PREP Act, into the Countermeasures Injury Compensation Program ("**CICP**"). The CICP is akin to a black hole into which Plaintiffs submit a request for benefits, then wait an indeterminate amount of time for a decision, and for those who have received any decision, are ultimately wholly denied. Plaintiffs have no access to judicial review and are left to cope with their physical injuries and all resulting financial, emotional, and mental injuries.

3.      Carolina Bourque used to travel extensively in her role with the Louisiana Department of Wildlife and Fisheries. Carolina loved to travel and hike, and she was always ready for an adventure. After receiving the Moderna vaccine, she cannot complete basic daily tasks, travel, or even drive.

4.      Emma Burkey, a healthy Nevada high school student, suffered blood clots in her brain and seizures less than two weeks after receiving the Johnson & Johnson ("**J&J**") vaccine. After three brain surgeries and thousands of hours of physical therapy, she struggles to walk, write, and care for herself. Her youth, as she knew it, is over. Her parents, who were on the verge of

2

retirement, now work around the clock beneath mounting debt, with the somber reality that Emma cannot possibly care for herself.

5.      Cody Flint, a husband, father, and pilot from Mississippi with over 10,000 flight hours, suffered immediate adverse reactions to the Pfizer vaccine, culminating in vertigo and ruptured inner ears two days later which nearly resulted in a deadly plane crash. Cody will never fly again because he cannot possibly afford all the treatment needed to repair his injuries. His family is "*flat broke, swamped in debt, and has no real path forward*."

6.      Michelle Zimmerman, PhD, a highly educated K-12 worker in Washington, suffered severe adverse events after she received the J&J vaccine to comply with federal guidelines and to set a positive example for her students. She is now medically disabled, suffering from a severe brain injury, and unable to work, drive, or walk for more than a few minutes at a time. In Michelle's words: "*I have had everything that I love stripped from me*."

7.      Jessica Krogmeier, a mother, registered nurse, and respiratory therapist from Iowa, received the Pfizer vaccine to comply with requirements for her profession. She used to dream of furthering her education and advancing into nursing leadership. Now, she cannot work full time because of her ongoing symptoms. Jessica used to be hopeful about the future, but her life has dramatically changed: "*I have no idea how it will feel day to day. I don't even think I will live to see my kid graduate.*"

8.      Despite their grievous injuries and the catastrophic effects on their lives, the only relief afforded to these Americans who "did the right thing" and got a COVID-19 vaccine is potential limited compensation under CICP. The federal law that created the CICP immunizes

vaccine manufacturers from financial liability.[1] In exchange, CICP is supposed to compensate those who are injured by "covered countermeasures" like the COVID-19 vaccine.[2] The purported purpose of CICP is to "provid[e] **timely, uniform, and adequate compensation** to eligible individuals for covered injuries and severe adverse events directly caused by the administration or use of a covered countermeasure"[3]; however, as detailed herein, CICP is akin to a Potemkin village; it is an elaborate façade designed to hide an undesirable reality. CICP is the epitome of a kangaroo court or a star chamber — a proceeding that ignores recognized standards of law and justice, is grossly unfair, and comes to a predetermined conclusion.

9.      As a critical reminder: taxpayer funds were used to develop, test, purchase, distribute, and promote the vaccines. The federal government also mandated the vaccine through every avenue it legally could (and sometimes went beyond that until corrected by the judicial branch) or incentivized mandates by state and local governments or private employers and schools.

---

[1] The only exception is for "willful misconduct." If a willful misconduct claim could be brought by the U.S. government under the Public Health Service Act or the Food, Drug, and Cosmetic Act, then a plaintiff cannot bring that claim unless the U.S. government does so first. For other willful misconduct claims, a plaintiff must satisfy an extremely high burden of proof, especially against a vaccine manufacturer. Notably, willful misconduct first requires that the plaintiff seek compensation through the CICP and so the program is inescapable. If a plaintiff's request is granted, he or she cannot sue for willful misconduct if he or she elects to receive that compensation. If the plaintiff chooses instead to file a lawsuit, injured persons may sue only in the U.S. District Court for the District of Columbia. Such lawsuits must meet heightened standards for pleading and discovery and are subject to procedural provisions generally favorable to defendants. Injured persons must prove willful misconduct by clear and convincing evidence (a higher standard than in a typical civil case), and recovery for noneconomic damages such as pain and suffering is limited. A plaintiff must show that a defendant acted (i) intentionally to achieve a wrongful purpose; (ii) knowingly without legal or factual justification; and (iii) in disregard of a known or obvious risk that is so great as to make it highly probable that the harm will outweigh the benefit. 42 U.S.C. §§ 247d-6d(c)(1)(A), (c)(3), (e)(1).

[2] CICP covers numerous "countermeasures," a category which includes more than COVID-19 vaccines. For purposes of the instant action, the only countermeasures applicable to Plaintiffs are the COVID-19 vaccines.

[3] 42 U.S.C. § 247d-6e(a) (emphasis added).

10.     The government consistently tested limits in a stated effort to protect Americans from COVID-19. Indeed, according to Justice Gorsuch, during the COVID-19 pandemic, Americans experienced "the greatest intrusions on civil liberties in the peacetime history of this country." *Arizona v. Mayorkas*, 143 S.Ct. 1312, 1314 (2023) (Gorsuch, J., concurring). Executive officials issued emergency decrees, shuttering businesses, schools, and churches; surveilling cities to enforce compliance with social distancing requirements under threat of criminal penalties; and divided cities and neighborhoods into color-coded zones that could be changed when challenged in the courtroom. *Id.* at 1314-15 (citing 10 cases of intrusions on civil liberties). The government painted the vaccine as the only way out of this crushing regime of restrictions on individual and civil rights that it imposed.

11.     Now, on the heels of the COVID-19 pandemic, the government refuses to compensate those who heeded the call and suffered the most severe vaccine injuries and, in doing so, denies them even the most basic of due process measures. The CICP as it functions now is fundamentally inconsistent with Congress' intent. CICP claims are consistently lost, ignored, denied, or caught up in the years-long purgatory of government bureaucracy. The compensation, if any, is neither timely nor adequate. Perhaps the decisions are uniform, but only in the sense that claims uniformly get lost in a black hole for years or are uniformly denied.

12.     Congress could remedy the defects in CICP by amending the PREP Act so that it satisfied Americans' constitutional rights and accomplishes the stated objective of providing timely, uniform, and adequate compensation to Plaintiffs and other individuals harmed by the COVID-19 vaccine. However, the legislation as currently drafted and implemented fails to provide the most basic protections required under the U.S. Constitution. The immunity to liability provisions within the PREP Act and the CICP are inextricably intertwined. As such, the

5

overarching rationale for providing liability protection to vaccine manufacturers under the PREP Act—that an **alternative and adequate remedy** for those injured by a COVID-19 vaccine exists—evaporates if the alternative and adequate remedy provided by Congress is itself unconstitutional. Accordingly, the PREP Act's immunity protections for vaccine manufacturers cannot stand as there is no constitutional alternative provided to vaccine injured citizens.

13.      Plaintiffs respectfully request that the Court enter an order (i) declaring that those provisions of the PREP Act pertaining to CICP, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, are unconstitutional and (ii) enjoining the federal government, pursuant to the Fifth and Seventh Amendments to the U.S. Constitution, from enforcing those provisions of the PREP Act that provide liability protection, unless the government provides the vaccine injured a reasonable alternative remedy with the following basic legal and constitutional protections:

    A.  provide an adequate statute of limitations that applies to all COVID-19 vaccine injury claims;

    B.  identify the name, title, and educational credentials of the individuals who are deciding COVID-19 vaccine injury claims;

    C.  confirm that such decision-makers have no conflicts of interest and provide a process to challenge any particular decision-maker for conflicts of interest;

    D.  identify any expert witnesses or consultants used by the government in making determinations;

    E.  provide claimants with a reasonable opportunity to question witnesses, including experts, or review evidence used against claimants;

    F.  provide claimants with a reasonable opportunity to question or obtain discovery from such experts, including producing copies of any expert reports;

    G.  allow claimants the opportunity to present expert witnesses on their behalf;

    H.  provide claimants with a reasonable opportunity to obtain discovery, including discovery from companies that manufactured or distributed the COVID-19 vaccines that harmed them;

    I.  produce copies of any records or documents used to decide COVID-19 vaccine injury claims;

    J.  provide notice to claimants and a reasonable opportunity to be heard before any decision;

    K.  preserve the right of claimants to present claims for damages in court, before a civil jury, if a claimant elects to do so;

    L.  allow claimants to seek reasonable recovery for all damages suffered, including related to medical treatment, loss of income or earning potential, death, and/or pain, suffering, and emotional distress;

    M.  provide that attorneys are eligible for attorneys' fees and costs as long as the claim was submitted in good faith and with a reasonable basis;

    N.  provide an appeal/judicial review of a COVID-19 vaccine injury decision in a court of law; and/or

    O.  maintain a written record of any hearings or proceedings for judicial review.

## JURISDICTION

14.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343.

15.    This action arises under the Fifth and Seventh Amendments to the United States Constitution.

## PARTIES

**A.**    **Plaintiffs**

16.    Plaintiff Carolina Bourque is and at all relevant times has been a citizen and domiciliary of the State of Louisiana, residing in Youngsville, LA.

17.    Plaintiff Emma Burkey is and at all relevant times has been a citizen and domiciliary of the State of Nevada, residing in Henderson, NV.

18.    Plaintiff Christopher Cody Flint is and at all relevant times has been a citizen and domiciliary of the State of Mississippi, residing in Cleveland, MS.

19.    Plaintiff Michelle Zimmerman is and at all relevant times has been a citizen and domiciliary of the State of Washington, residing in Seattle, WA.

20.    Plaintiff Jessica Krogmeier is and at all relevant times has been a citizen and domiciliary of the State of Iowa, residing in Donnellson, IA.

**B.**     **Defendants**

21.     Defendant United States Department of Health and Human Services ("**HHS**") is a cabinet-level executive branch department within the United States Federal Government.

22.     Defendant United States Health Resources and Services Administration ("**HRSA**") is an Operating Division of HHS. HRSA administers the Countermeasures Injury Compensation Program ("**CICP**"), at issue in this suit.

23.     Defendant John Does 1-3 (collectively, "**John Does**") are individuals charged with supervising, managing, directing, or operating CICP. As set forth below, various Plaintiffs have requested identification of John Does, but CICP, HHS, and/or HRSA have not disclosed their identities to date.

## STATEMENT OF FACTS

**A.**     **Carolina Bourque**

24.     In 2021, Carolina had been working as a biologist at the Louisiana Department of Wildlife and Fisheries for 13 years. In her role as an oyster manager biologist, she traveled extensively, participated in conferences and meetings nationwide, and was responsible for managing and protecting Louisiana's oyster natural resources, including management of approximately 1.7 million acres of public oyster areas. Although Carolina managed seasonal allergies, she was in good overall health. She enjoyed a full and active life.

25.     Everything changed on March 17, 2021, when Carolina received a Moderna COVID-19 vaccine and immediately suffered an anaphylactic-type reaction, with a rash on her arm and torso, tachycardia, dizziness, shortness of breath, and intense gastrointestinal pains that would last for months. She lost her hearing and had veins that popped on the inside of her arm within two hours after receiving the vaccine.

8

26.     On March 23, 2021, when her ongoing medical issues had not improved, Carolina visited her primary care physician. Her physician took blood work, completed an ultrasound of Carolina's abdominal area, and referred her to a gastroenterologist. Within a few weeks, she also visited an ear, nose, and throat ("**ENT**") specialist and a pain management doctor. Doctors performed an MRI and multiple other tests.

27.     On June 17, 2021, at the recommendation of her physicians, Carolina proceeded with a second COVID-19 shot. She was immediately dizzy and stayed at the pharmacy for 30 minutes so she would not faint. By the second day, Carolina could not get out of bed. Her leg and arms were weak, and she developed facial paralysis/Bell's palsy and migraines. Carolina became dizzy and confused. She could barely perform work at her computer because her eyesight became blurry, preventing her from reading the words on the screen.

28.     Carolina's primary care physician initially identified an adverse vaccine reaction to the COVID-19 vaccine, but he was unwilling to make a report to the Vaccine Adverse Event Reporting System ("**VAERS**"). Carolina filed a VAERS report herself (ID #1502325) on July 26, 2021. She later filed an updated VAERS report (ID #1951207) on December 15, 2021. A true and accurate copy of the December 15, 2021 VAERS report is attached as **Exhibit 1**.

29.     After multiple new doctor visits, including a neurologist, rheumatologist, and an ENT specialist, Carolina was ultimately diagnosed with dysautonomia/autonomic dysfunction, small fiber neuropathy, peripheral neuropathy, mast cell activation syndrome, hemiplegic migraines, vestibular migraines, and chronic fatigue syndrome, among other diagnoses. Even after 27 months, Carolina continues to receive new diagnoses. Doctors have been baffled by her vast array of symptoms. As of the date of this Complaint, Carolina continues to search for a

knowledgeable neurologist who can develop a better treatment plan, and she continues to get referrals to other specialists to see who can help her.

30.     Carolina is unable to complete basic tasks, including driving more than a 15-minute radius, speaking in public, or attending any event with loud noises or lights. She suffers from brain fog, fatigue, and dizziness on a daily basis. Carolina also deals with inflammation and painful sensations that vary between shocking pains to tingling and numbness throughout her body.

31.     Carolina's injuries forced her to leave her position as an oyster manager to become a low-level biologist, with lower pay, more basic daily tasks, and minimal public contact, phone calls, and travel. Carolina now works from home three days a week at a computer station, and once a week she rides to work with her husband because she often cannot drive without getting confused and dizzy. Carolina takes daily breaks and, most weeks, she cannot fulfill her basic 40-hour work schedule.

32.     Since her injury, Carolina has spent over $30,000 on medical expenses, including ongoing testing and treatment. Despite visits to numerous specialists, special diets, and supplements, Carolina has yet to find effective treatments to manage her vaccine injuries. She sees no pathway to improvement going forward.

33.     In March 2022, Carolina made a claim with the CICP before the expiration of her one-year deadline. Carolina directed her physicians to submit medical records, both in paper and online via the Injury Compensation electronic submission website, associating her new symptoms and diagnoses to a vaccine reaction. Almost a year later, CICP representatives continued to claim that they did not have any of her records. They could provide no guidance regarding the timeline for determining claims nor identify who would be reviewing and deciding claims. An excerpt of a

transcribed conversation Carolina had with CICP on February 8, 2023, more than a year after

submitting her request for benefits, follows:

> 0:03:33 Carolina Bourque
> So you have received the medical records, correct?

> 0:03:38 CICP Representative (Juan)
> No, they have not. They either have not or they have not updated.

> 0:03:42 Carolina Bourque
> Because I know for sure two doctors have submitted the medical records. So who decides to upload, you know, the medical records or what's the timeline on that? It was submitted last year.

> 0:03:57 CICP Representative (Juan)
> So unfortunately, **we don't really have a time frame**. But what I can do is I can get your information down, have the department take a look into it, give you a call back and confirm with you which documents were received or if they need any additional documentation.

> 0:04:13 Carolina Bourque
> …[W]ho decides, you know, on the documentation, like, who do you guys have like, a panel to review the documentation or or how does it work?

> 0:04:26 CICP Representative (Juan)
> The documentation is reviewed by medical staff team members. They, they go ahead and review those records and, and make that decision.

> 0:04:34 Carolina Bourque
> OK. And this medical team like, where are they? You know, are they hired by you guys, specifically, contractors? Are they like consultants or something?

> 0:04:52 CICP Representative (Juan)
> I'm, I'm not sure. I think the credentials are in the medical field, so they're, they're most likely doctors. From what I'm being told, that's, that's who essentially reviews those records. It's not someone who isn't qualified, and that's what I can assure you, as, as that they've informed us that they are accredited and they are knowledgeable in that field. So when they are reviewing the medical records you can rest assured it's someone that's qualified to review them.

> 0:05:25 Carolina Bourque
> OK, now what happens if there's more than 240 days passed and there's no determination, especially for example, in my case, I submitted March of last year and it's close to 365 days. So what, what happens?

> 0:05:44 CICP Representative (Juan)

So it's, **it's not uncommon that it's been this long. We've had individuals as well in your situation**. What we do is we just escalate the matter and have the department contact you directly and kind of, like, reassure you that they, they still have your paperwork. In many cases ma'am, I'm going to be quite honest with you the medical records that I've sent, they are provided. It's just more so on the department to update that information, There, **I believe there may be a big backlog** and not giving any, any information in regards to that, but it's it's, it's better if we just have them contact you.

A true and accurate copy of a recording of Carolina's first telephone call to CICP on February 8, 2023 is attached as **Exhibit 2**.

34.     Carolina called CICP a second time and spoke with a second CICP representative, who again could provide no timeframe for claim determination:

> 0:02:15 CICP Representative (Jennifer)
> [CICP] does not give updates online. You receive letters throughout the process. **It is a delayed process**. So it does take time to receive letters from the CICP.
>
> 0:02:25 Carolina Bourque
> So it takes time. Like how long? What's the usual time for revision for each application? I submitted mine last year.
>
> 0:02:35 CICP Representative (Jennifer)
> **There's no time frame**, how long it can take.
>
> 0:02:38 Carolina Bourque
> Oh, there's no time frame.
>
> 0:00:2:40 CICP Representative (Jennifer)
> No ma'am.

A true and accurate copy of a recording of Carolina's second telephone call to CICP on February 8, 2023 is attached as **Exhibit 3**.

35.     More than a year and a half after submitting her claim, Carolina has received no determination or updates from CICP.

**B.     Emma Burkey**

36.     Emma Burkey was a healthy 18-year-old senior attending high school in Nevada. By the spring of 2021, Emma had a 4.3 GPA, attended classes online, had a black belt in karate,

and juggled multiple part-time jobs. Emma planned to attend UNLV in the fall. Although she was

undecided in her major, Emma always knew that her career path would involve children.

37.     On March 20, 2021, Emma received the J&J COVID-19 vaccine because she

believed it would help keep the children around her safe. Emma trusted J&J because it is known

as a "baby [products] company."

38.     For a week and a half following her vaccination, Emma experienced intermittent

nausea, increased heart rate, and headaches. Emma was told to expect these side effects, so she

was not immediately concerned.

39.     On March 31, 2021, Emma returned to work with her mother. She left work early

because of migraine headaches. On April 1, 2021, Emma went to work again. She experienced

severe headaches, but she finished the day and went to bed early that evening.

40.     Emma woke early in the morning on April 2, vomited in bed, and had her first

seizure, 11 days after her vaccination.

41.     Emma was immediately transported by ambulance to the emergency room at Saint

Rose Dominican Hospital in Las Vegas. Scans revealed that Emma had a small brain bleed, which

progressively worsened, as she developed Cerebral Venous Sinus Thrombosis due to blood

clotting in her brain. Her brain hemorrhaged and she began seizing constantly, with rapid

temperature and heart rate increases. By the end of the day on April 2, 2021, Emma was no longer

responsive.

42.     Emma's infectious disease doctor, Dr. Brian Lipman, immediately suspected that

Emma was suffering an adverse reaction to the J&J vaccine because Emma's symptoms mirrored

adverse events associated with the AstraZeneca vaccine in Europe.[4] Doctors at Saint Rose began calling and emailing the CDC and J&J requesting guidance. They received no response from either the health agency or the pharmaceutical company over the weekend.

43.     By the early hours of April 3, 2021, Emma's parents made the difficult decision to allow doctors to place Emma in a medically induced coma and intubate her.

44.     The next day, April 4, doctors informed Emma's parents that their daughter would likely die if they did not perform brain surgery to open the clots in her brain. They proceeded with surgery. Unfortunately, a post-surgery MRI showed more clots filling inside Emma's brain. Doctors met with Emma's parents again and determined they needed to perform a second brain surgery.

45.     Emma endured a second brain surgery on April 5, 2021. She did not wake up. Brain scans showed no blood flow through the top of Emma's head after the surgery. The clots in Emma's brain had become so severe that physicians believed she would remain in a persistent vegetative state for the rest of her life.

46.     Doctors at Saint Rose had exhausted all options. They continued to request guidance from the federal government and J&J. Again, no response was provided. Hospital leaders recommended that they search nationwide for another hospital that could help.

47.     On April 6, 2021, Emma was transferred to the Neurologic Intensive Care Unit at Loma Linda University Hospital in California. Two days later, physicians at Loma Linda performed a third brain surgery on Emma.

---

[4] https://www.youtube.com/watch?v=iy9qBxGbGPw at 1:25 (local news interview with Emma's doctor, Dr. Lipman, speaking about her case).

48.     On April 9, 2021, Emma began to show signs that she was slowly regaining consciousness.

49.     Emma's story gained national attention in April 2021, when the FDA paused the rollout of the J&J vaccine because Emma and five other women between the ages of 18 and 48 suffered the same catastrophic reaction.[5] As of January 2022, the CDC reported that eight people (six women, two men) had died from similar conditions shortly after receiving the J&J COVID-19 shot.[6]

50.     In the days and weeks that followed, Emma began taking small steps that previewed the long journey ahead. On April 15, Emma first awoke from her coma,[7] but was left in a quadriplegic state and was constantly vomiting due to her inability to digest food. Emma eventually had her feeding tube removed on May 27, 2021.

51.     After hundreds of hours of therapy in the hospital, Emma was discharged in August 2021. Her life now consists of neurologic restorative therapy five days per week, from 9 am until 3 pm. Medical professionals work with Emma every day to re-map areas of her brain that have been damaged. Emma continues to fight to regain motor function, including the ability to walk, write, and care for her own personal hygiene.

52.     In addition to the obvious trauma Emma's family has been through in watching their daughter suffer and wonder if she would live and, if so, with what quality of life, Emma's

---

[5] FDA, *Joint CDC and FDA Statement on Johnson & Johnson COVID-19 Vaccine* (Apr. 13, 2021), available at: https://www.fda.gov/news-events/press-announcements/joint-cdc-and-fda-statement-johnson-johnson-covid-19-vaccine.

[6] CDC, *Use of the Jannsen (Johnson & Johnson) COVID-19 Vaccine: Updated Interim Recommendations from the Advisory Committee on Immunization Practices (Jan. 21, 2022)*, available at: https://www.cdc.gov/mmwr/volumes/71/wr/mm7103a4.htm.

[7] *See* https://www.youtube.com/shorts/M2iiUxnEW3M.

family has faced increased insurance premiums because of the ongoing medical expenses. The first bill they received was for $650,000 and they have continued since then.

53.     Emma's family had to purchase a new home to accommodate her condition. They moved from the family home that was almost fully paid off and into a one-story home with an open floorplan that is easier for Emma to navigate. Emma's family now has a $520,000 mortgage, having bought their home at the peak of the market, which they did not anticipate as they approached retirement age. Emma's family also purchased and repaired a wheelchair-accessible van, at an estimated cost of $60,000. Because of the mounting repairs on the van, Emma's family purchased another used wheelchair van for over $49,000. Emma's dad drives her to and from physical therapy, a 36-mile round trip, two times a day (72 miles per day), five days per week, spending hundreds of dollars on gas. They also rented a home while searching for a new home and spent thousands of dollars while at Loma Linda.

54.     Emma submitted a claim to CICP over two years ago, in November 2021. In the most recent call, CICP representatives provided no timeline for deciding her claim, stating repeatedly and coldly that it would be a "hot minute" until any decision was made.

**C.     Cody Flint**

55.     Cody Flint is a husband, father of two boys and an experienced pilot from Mississippi with over 10,000 flight hours. For 15 years, he was employed as an agricultural crop-dusting pilot. As a requirement of his position, Cody was required by law to obtain annual Federal Aviation Administration ("**FAA**") physicals to keep his pilot license current. He has done so every

16

year since he was 17 years old. Cody's annual physicals, including his last FAA flight physical in January 2021, showed he was in excellent health, with no pre-existing conditions.

56.     On February 1, 2021, only twelve days after his most recent FAA flight physical, Cody received his first COVID-19 Pfizer vaccination due to extreme pressure to do so from his employer. Within 30 minutes, he developed a severe headache which moved down the back of his neck and became a burning sensation at the base of his skull. Cody became dizzy, and his eyes could not focus properly.

57.     On February 3, 2021, Cody resumed flying after observing the 48 hour no-fly rule required of pilots after COVID-19 vaccination. Immediately after takeoff on this crop-dusting flight (for which he was the only pilot and occupant of the plane), Cody experienced tunnel vision. Approximately one hour into the flight, his condition rapidly deteriorated with intensified headache, cold sweats, worsening dizziness, visual changes, disorientation, and uncontrollable shaking. Cody lost consciousness multiple times during the flight, but against extreme odds he was able to land safely before losing consciousness again and having to be pulled from the plane — none of which he recalls. Cody was flying a non-pressurized plane at an altitude no higher than 200 feet.

58.     Cody was diagnosed with vertigo and a subsequent MRI and CT scan of his brain revealed bilateral ethmoid, maxillary, sphenoid, and frontal sinus inflammatory changes, and bilateral paranasal sinus inflammatory changes. Cody's symptoms progressed, and he was prescribed various medications that prevented him from operating an aircraft. On February 12, 2021, Cody submitted a VAERS report documenting his injuries. A true and accurate copy of Cody's February 12, 2021 VAERS report is attached as **Exhibit 4**. Cody sought medical care from several physicians, one of whom stated, "I think that shot made you one sick son of a bitch," and

17

each of whom noted his rapid onset of symptoms post-vaccination. In fact, Pfizer reached out to one of Cody's physicians regarding his VAERS Report.

59.     After seeing numerous doctors, Cody was ultimately diagnosed with left and right perilymphatic fistulas (a tear in the membranes that separate the air-filled middle and fluid-filled inner ear), elevated intracranial pressure, and bilateral eustachian tube dysfunction. Cody's simultaneous left and right perilymphatic fistulas, highly increased intracranial pressure, and rapid onset of a severe headache were all indicators of a vaccine injury.

60.     On March 25 and June 3, 2021, Cody underwent surgery for left and right perilymphatic fistula repairs, bilateral ventilation tube placement, microdissection, and a lumbar puncture. He continues to suffer from ongoing symptoms and can no longer work as a pilot.

61.     On April 25, 2021, Cody submitted his Request for Benefits form to CICP. Over a year later, after dozens of follow-ups by Cody, and after United States Senator Cindy Hyde-Smith contacted the CICP multiple times and even questioned the HHS Secretary regarding Cody's case during a May 4, 2022 public hearing,[8] Cody's request was denied on May 25, 2022. A true and accurate copy of the CICP denial letter signed by George Grimes, M.D. is attached as **Exhibit 5**.

62.     The denial letter absurdly stated that "barotrauma from flying is a known cause of perilymphatic fistulas, and the symptoms of the perilymphatic fistulas (severe vertigo) began while flying." This completely ignores that Cody was flying (as he did for 15 years) in an unpressurized plane at an altitude no greater than 200 feet, which would not induce barotrauma. In fact, barotrauma was the first condition ruled out by Cody's doctors because pilots do not suffer barotrauma by flying a few hundred feet above sea level in an unpressured cabin. By comparison,

---

[8] "Senator Hyde-Smith Cites Mississippi Case in Questioning HHS Injury Compensation Program," available at: https://www.youtube.com/watch?v=YGAhSLqFV9A (accessed December 10, 2023).

commercial airline pilots and passengers fly 8,000 feet above sea level (40 times higher) in a pressurized cabin and would face an exponentially greater risk of barotrauma.

63.     On June 15, 2022, pursuant to CICP processes, Cody requested reconsideration of the denial of benefits. CICP denied Cody's request for reconsideration on January 18, 2023 — 21 months after Cody submitted his original request.

64.     Cody's salary is now reduced to 20% of what he had been making as a pilot. Compounding that ongoing loss, Cody did not have health insurance at the time of his vaccination and resulting injuries. He has already spent his family's entire savings, including his children's future college tuition, in an effort to get well enough to return to flying. That was a futile attempt that financially buried his family. His doctors tell him he needs significantly more treatment, but he cannot afford to get it.

**D.     Michelle Zimmerman**

65.     Prior to her COVID-19 vaccination, Michelle Zimmerman was a book author, published in five languages, and a researcher commissioned by General Motors and the International Society for Technology in Education. She had a meeting scheduled with the education advisor to Washington Governor Jay Inslee the week of her COVID-19 vaccination and was in the top running for the Global Teacher Prize.

66.     Michelle was a full-time K-12 worker and STEM educator in Renton, Washington. She was highly physically active when HHS issued a directive to make available and administer vaccines to teachers, childcare workers, and staff.[9] A true and accurate copy of the White House

---

[9] *See* HHS, *Secretarial Directive for Prioritization of COVID-19 Vaccines and Administration for Certain Educational and Child Care Workers*, dated March 2, 2021, *available at*: https://www.hhs.gov/sites/default/files/secretarial-directive-prioritization-covid-19-vaccines.pdf.

Press Release, dated March 7, 2021, concerning the prioritization of COVID vaccines for educators is attached as **Exhibit 6**. Consistent with these directives, Michelle's local public health officials confirmed she was required to obtain at least one dose of the COVID-19 vaccine by the end of March 2021.

67.     On March 14, 2021, in an effort to remain in compliance with the President's authorization for frontline education workers in K-12 schools to obtain a first dose of the COVID-19 vaccine by the end of March 2021, to allow her to remain in a teaching position, and to set a good example for her students and those who were hesitant to get vaccinated with a new product, Michelle went to a mass vaccination site in King County, Washington. Michelle received the J&J COVID-19 vaccine.

68.     Moments after her shot, Michelle experienced shooting pain down her injection arm and wrist, and up to her left ear. Within 20 minutes of the injection, Michelle began experiencing tongue and throat swelling (anaphylaxis), which was recorded as an adverse event by healthcare officials at the mass vaccination site. Because those administering her vaccine failed to follow requirements for administering a vaccine under emergency use authorization ("**EUA**") and did not send her for medical observation or treatment, Michelle's medical condition worsened. Michelle has since experienced irreversible brain and vision damage.

69.     Michelle had no underlying medical conditions before receiving the COVID-19 vaccination. Since receiving the shot, Michelle has been medically disabled and not medically cleared to return to work, drive, or travel, or to engage in cardio exercise.

70.     Michelle now lives with her parents because she is unable to live independently. She cannot even drive herself to medical appointments.

71.     Michelle continues to suffer from a host of medical conditions, including brain damage, vision damage, vestibular damage, vascular damage, blood clotting, mitochondrial damage, damage to gut microbiome, skin and hair loss, and nerve damage. She has also experienced a substantial shift in body composition, including muscle waste and muscle coordination impairment (ataxia), not explained by dietary changes. In the over two years following her vaccine injury, extensive clinical and specialized medical testing have revealed no causes for her injuries other than the COVID-19 vaccine.

72.     The frustration Michelle feels on a daily basis matches the devastation and severe physical pain of the physical symptoms. She had been saving all of her money to buy a house. Now, she could never hope to live independently and has instead burned away her savings on medical care.

73.     Michelle learned through her own research that she could pursue benefits through CICP. In September 2021, she contacted CICP to request a guide for the standard for proof of causation that would be required so that she could be sure to submit all required information. CICP representatives advised Michelle that no standard or guideline existed, but that quantitative data and peer-reviewed, published scientific research would meet the standard for proof of causation.

74.     On October 1, 2021, after spending weeks compiling it, Michelle submitted a Request for Benefits form to CICP through the electronic portal. Her claim package included 300 pages of her relevant medical records and proof of causation. Michelle received online confirmation that her application and medical records were received in October 2021.

75.     Michelle repeatedly requested updates from CICP officials and confirmation that her medical records had been received. Initially, she spoke with a CICP representative named David who could not confirm a timeframe for when her claim would be processed. On November

22, 2021, Michelle received a return call from a customer service representative who identified

herself as Phyllis. A true and accurate copy of a recorded excerpt of Michelle's November 22,

2021 telephone conversation is attached as **Exhibit 7**. During the call, Michelle was informed that

CICP had no record of her claim, that she must re-apply and wait 40 days to see if the claim was

posted on the system, and then repeat the process of re-applying if CICP lost her claim again.

When Michelle asked to speak with a supervisor or to be given a supervisor's contact information,

Phyllis responded that she could not provide that information. *Id.*

76.     Months later, after multiple communications, Michelle was connected with Captain

Dale Mishler, Chief of Countermeasures and Review Panel Branch. During their April 24, 2022

telephone conversation, Captain Mishler assured Michelle that, contrary to prior statements by

CICP representatives, CICP had received her medical records. Captain Mishler also confirmed that

CICP provides no guideline to the public regarding the required standard of proof to be applied:

> 05:38 Michelle Zimmerman
> So there's not actually a published document that's made public for people to access prior
> to submitting the claims?
>
> 05:46 CICP Representative (Capt. Mishler)
> Regarding?
>
> 05:48 Michelle Zimmerman
> What you're using for the standard of proof. For example, what journals you're using, what
> medical research you're using, so that people have access to know what you are using to
> compare their submitted claims, and what your reviewers are using to determine if it meets
> those claims.
>
> 06:03 CICP Representative (Capt. Mishler)
> Um, we're, we're using up to date, we're using, uh, PubMed, we're using the National
> Institutes of Health's, uh, medical library. Um, and all of those, all of the evidence has to
> be based in a peer reviewed published journal.
>
> 06:20 Michelle Zimmerman
> And that makes sense, I under-, and I do understand that part. But what I'm saying is what
> guideline is available to the public — so before they submit their claim, they know what

you're looking for, which journals you're using, which researchers you find acceptable or
not — especially since…

06:35 CICP Representative (Capt. Mishler)
The [inaudible] guideline for that? No.

06:37 Michelle Zimmerman
Okay, so there is no guideline? Okay.

06:37 CICP Representative (Capt. Mishler)
No, no.

A true and accurate copy of a recorded excerpt of Michelle's April 24, 2022 telephone conversation

is attached as **Exhibit 8**.

77.     For over two years, CICP officials have delayed, providing contradictory answers

without any indication that resolution of Michelle's claim is forthcoming. In March and April

2022, CICP told her that no case number had been assigned. But almost a year later, Michelle

received an express mailer dated January 11, 2023, containing a letter backdated to January 1,

2022 (a federal holiday and weekend), with a case number, signed by Dr. George Grimes. A true

and accurate copy of the letter and mailer are attached as **Exhibit 9**.

78.     Michelle also received a letter in an extremely urgent mailer stating that CICP was

missing medical records, even though she had been assured previously that her records were

received. Michelle submitted records both online through the CICP electronic portal and via

certified mail, but CICP repeatedly provided conflicting information.

79.     Over two years after submitting her claim, there is no indication when a

determination will be made on Michelle's claim. Michelle still suffers daily with all of the above-

described symptoms and her life has not returned anywhere close to her pre-vaccination "normal."

### E.    Jessica Krogmeier

80.    From 2004 through 2020, Jessica Krogmeier had extensive experience in the healthcare industry. During that time period, she attended nursing school and was employed in various roles as a respiratory therapist and registered nurse. She was ambitious, goal-oriented, and had dreams of advancing her education and moving into a nursing leadership position.

81.    Jessica had resigned from her position in October 2020 to recover from a pregnancy loss.

82.    While preparing to return to work in the summer of 2021, Jessica understood that the COVID-19 vaccine would be required for any nursing position she would obtain. Thus, on September 3, 2021, Jessica received her first Pfizer COVID-19 vaccine.

83.    Before receiving her shot at a pharmacy, Jessica spent time discussing potential side effects with the pharmacist. Jessica was concerned because her son was getting surgery the following week. The pharmacist counted the number of days (four) on his fingers and told Jessica, "You should be fine by then." Jessica also expressed concerns because she was breastfeeding at the time. The pharmacist said he had just read a study out of Israel and he was comfortable with Jessica taking the shot, and that she could continue breastfeeding her daughter.

84.    Immediately after receiving her first COVID-19 vaccine, Jessica felt dizziness, numbness, tingling, exhaustion, severe arm pain, chest pain, and the inability to sweat. A VAERS report (ID #1678480-1) was submitted on September 7, 2021. A true and accurate copy of Jessica's September 7, 2021 VAERS Report is attached as **Exhibit 10**.

85.    Jessica was unable to stay with her infant daughter by herself for almost four weeks due to a host of ongoing and progressing symptoms following her COVID-19 vaccination.

86.    Before receiving the COVID-19 vaccine, Jessica rarely had to go to the doctor. Since receiving the shot, Jessica has been evaluated by many specialists and had multiple diagnostic tests and laboratory tests. Jessica's providers consistently noted the rapid onset of symptoms after she received the COVID-19 vaccine.

87.    Following her vaccine, Jessica has been diagnosed with small fiber neuropathy, pre-diabetes, and autonomic dysfunction. She continues to suffer, at various times, from dizziness, extreme fatigue, internal tremors, tinnitus, painful periods, numbness and tingling in all the limbs, ear pain and fullness with changes in hearing, chest pain, elevated heart rate, trigeminal nerve pain, brain fog, abdominal pain, diarrhea, lumps under the skin, and orthostatic lightheadedness.

88.    Jessica's vaccine injuries have also significantly limited her employment prospects. She currently works on a reduced schedule as a cardiac and pulmonary rehab nurse because she cannot predict how she will feel from day to day. Although she performs her duties to the best of her ability, Jessica can barely work three days per week and could not consider a more rigorous nursing position. Today, Jessica just hopes to feel well enough to get out of bed, to endure the dizziness, joint pains, and burning sensations, and to work part-time for as many years as she has left.

89.    To date, Jessica has spent close to $10,000 out of pocket to cover her ongoing medical treatments and out-of-state travel to see specialists, with this amount expected to increase. Because her vaccine injury has significantly limited her ability to manage a full-time workload, Jessica has also lost at least $35,000 per year in earning potential. Jessica was also forced to withdraw $10,000 from her 401(k) account to make ends meet.

90.    Jessica continued breastfeeding her daughter after she received the COVID-19 vaccine, even despite her vaccine injury, as she had been told by the pharmacist administering the

vaccine that she could continue to breastfeed. Jessica's daughter had been a healthy, growing baby for the first four months of her life. After Jessica received the COVID-19 vaccine and continued to breastfeed, her infant daughter suffered from rashes, diarrhea, and stopped gaining weight for six months. Jessica's daughter was hospitalized and received breathing treatments and was diagnosed with asthma. Her daughter has since received steroid treatments six times.

91.    In September 2021, Jessica submitted an online request for benefits to CICP. Jessica also submitted a CICP claim with supporting documentation for her daughter before the one-year deadline in September 2022. To date, she has not received a response to either request.

92.    On February 9, 2023, Jessica called CICP to confirm the status of her claim. Although Jessica's physicians had already submitted records, the CICP representative informed Jessica that no records had been provided and that CICP had no timeline for determining claims. The following is an excerpt from a transcript of that call:

> 0:07:47 Jessica Krogmeier
> OK. Well, what is the timeline for deciding the request, then, once you get everything that you need?
>
> 0:07:54 CICP Representative (Phyllis)
> **There is no timeline**.
>
> 0:07:56 Jessica Krogmeier
> OK.
>
> 0:07:56 CICP Representative (Phyllis)
> The only timeline on this is the one for opening a claim. You have one year to open the claim, but **after that there's no timeline**.
>
> 0:08:04 Jessica Krogmeier
> So it could take several years to decide a claim.
>
> 0:08:08 CICP Representative (Phyllis)
> It can. It can, but right now with yours, it's not going anywhere because we don't have medical records. So it's still just sitting in the beginning stage.
>
> 0:08:18 Jessica Krogmeier

26

And that's interesting because I sent them, so I'll have to check into that. But excuse me, what happens if more than 240 days passed? Then? Because I've seen some stuff about that and there hasn't been a determination what happens then?

0:08:33 CICP Representative (Phyllis)
You know **they have however long they need to make a determination**.

A true and accurate copy of Jessica's recorded telephone call to CICP on February 9, 2023 is attached as **Exhibit 11**.

93.    During this call and a subsequent call, the CICP representative confirmed that (i) Jessica's claim would be decided by an unidentified team of doctors, lawyers, or other individuals; (ii) requests for reconsideration may or may not be determined by the same team or teams; and (iii) the representative did not know whether individuals deciding claims have any conflicts of interest. A true and accurate copy of Jessica's second recorded telephone call to CICP on February 9, 2023 is attached as **Exhibit 12**.

**F.    The PREP Act and CICP**

94.    CICP was established as part of the Public Readiness and Emergency Preparedness Act of 2005 ("**PREP Act**")[10] to provide "timely, uniform, and adequate compensation to eligible individuals for covered injuries directly caused by the administration or use of a covered countermeasure." 42 U.S.C. § 247d-6e(a).

95.    The PREP Act authorizes the HHS Secretary to issue a declaration that "a disease or other health condition or other threat to health constitutes a public health emergency." 42 U.S.C. § 247d-6d(b).

---

[10] Public Readiness and Emergency Preparedness Act of 2005, Pub L. No. 109–148, 42 U.S.C. §§ 247d-6d, 247d-6e (2005).

96.     The PREP Act provides immunity to "covered persons" from liability under federal and state law for "all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure if a declaration under subsection (b) has been issued with respect to such countermeasure." 42 U.S.C. § 247d-6d(a)(1).

97.     The PREP Act carves out a narrow exception to immunity for cases of serious injury or death caused through "willful misconduct." In cases of willful misconduct, the injured person or the person's survivors must first file in CICP and, if denied or if they do not accept the offered compensation, must then file suit in the United States District Court for the District of Columbia and prove the injuries by clear and convincing evidence. 42 U.S.C. § 247d-6d(c)(3), (e)(1).[11] In all cases aside from willful misconduct claims, individuals injured by a covered countermeasure must also seek redress from CICP without any option of filing suit in court.

**G.      Claims for COVID-19 Vaccine Injuries Under CICP**

98.     On January 31, 2020, the former HHS Secretary, Alex M. Azar II, declared a public health emergency for the entire United States in response to the COVID-19 outbreak. The January 2020 declaration and thirteen subsequent renewals provided protections to, among others, manufacturers and distributors of COVID-19 vaccines (countermeasures).

99.     As of December 1, 2023, 12,700 CICP claims have been filed related to COVID-19 countermeasures. The statistics speak for themselves: to date, CICP has compensated only **ten** of those claims, nine for myocarditis and myopericarditis and one for anaphylaxis.[12] The average

---

[11] For most claims against manufacturers or distributors with respect to a covered countermeasure, either the Secretary of HHS or the Attorney General must first initiate an enforcement action as a condition of suit. *See* 42 U.S.C. § 247d-6d(c)(5)(A).

[12] HRSA, *Countermeasure Injury Compensation Program (CICP) Data* (Dec. 1, 2023), available at: https://www.hrsa.gov/cicp/cicp-data.

payout on COVID-19 vaccine injury claims to date is $3,694.50. By comparison, CICP's average payout on injuries related to the H1N1 vaccine was $198,450.12.[13] Over 85% (10,863/12,700) of the COVID-19 countermeasure claims remain "pending review or in review." In rare instances where a decision has been reached, 98% of those COVID-19 countermeasure claims have been denied (1,799/1,837). CICP has awarded compensation to a lamentable 0.08% of total COVID-19 claimants (10/12,700), and benefits determinations remain pending for 0.21% of total COVID-19 claimants (27/12,700).[14]

100.    CICP's process is shrouded in secrecy. Although only Defendants have full access to their internal policies and procedures for deciding and rejecting requests for compensation, Plaintiffs identify all of the facts presently known below about the claims submission and review process.

101.    HRSA's website[15] describes the process as follows:



---

[13]   HRSA, *Table 4. CICP Claims Compensated (Fiscal Years 2010-2023)*, available at: https://www.hrsa.gov/cicp/cicp-data/table-4.

[14]   HRSA, *Countermeasure Injury Compensation Program (CICP) Data* (Dec. 1, 2023), available at: https://www.hrsa.gov/cicp/cicp-data.

[15]   *See* https://www.hrsa.gov/cicp (accessed December 12, 2023).

102.    Thus, publicly available information suggests that the process for submitting a

COVID-19 vaccine injury claim, or a "Request for Benefits" to CICP has four steps:

- First, a claimant submits a Request for Benefits Package to CICP, via mail or the electronic portal available on the CICP website. The Request for Benefits Package is comprised of (i) a completed CICP Request for Benefits Form;[16] (ii) a completed Authorization for Use or Disclosure of Health Information Form for each health care provider that treated the claimant;[17] (iii) proof of administration or use of a COVID-19 vaccine; and (iv) medical records and hospital records on or after the date of administration of the COVID-19 vaccine, and medical records for one year prior to use or administration of the COVID-19 vaccine, as necessary, to show pre-existing medical history.

- Second, after submitting the Request for Benefits Package, the claimant's case is placed in the CICP queue for review by unidentified "CICP medical staff." CICP's website states that "the time it takes for the CICP to process a Request for Benefits depends partly on the complexity of [the] case."[18]

- Third, CICP makes an eligibility determination. If eligible, CICP may request additional documentation to determine how much compensation should be provided. If not approved, CICP will provide written notice that the claim has been denied.

- Fourth, when CICP issues a denial, the claimant may request reconsideration from HHS within 60 days by mail (to the same address to which the original Request for Benefits was submitted).[19]

103.    Beyond this high-level information provided online by the government, there are

very few details concerning the CICP process available to the public.

---

[16] *See* https://www.hrsa.gov/sites/default/files/hrsa/cicp/cicp-request-form.pdf  (accessed December 12, 2023).

[17] *See* https://www.hrsa.gov/sites/default/files/hrsa/cicp/cicp-authorization-form.pdf (accessed December 12, 2023).

[18] https://www.hrsa.gov/cicp/faq (see question "How much time does it take to process my Request for Benefits?").

[19] https://www.hrsa.gov/cicp/faq (see question "What if the CICP determines that I am not eligible for benefits?").

## H.      Lack of Transparency and Safeguards in CICP Process

104.    As detailed above, Plaintiffs have attempted to obtain additional information from Defendants regarding Plaintiffs' respective Requests for Benefits. The paragraphs that follow describe Plaintiffs' findings to date.

105.    Initially, claims are submitted (by electronic portal or by hard copy via mail) to unidentified CICP representatives for review.[20] The government refuses to identify the name, title, or educational credentials of the individuals deciding CICP claims. Defendants provide no opportunity to interact with, much less question or challenge, those who are deciding Plaintiffs' requests.

106.    Plaintiffs have no way to confirm whether any individuals deciding claims have any conflicts of interests, including whether any of them have ever reviewed, promoted, profited from, or mandated the COVID-19 vaccine.

107.    The government provides no timeline for deciding requests. Plaintiffs have no way of tracking requests until they receive a case number at some uncertain time in the future.

108.    The government provides no opportunity for discovery nor any method to request or review documents relied upon to reach its determination.

109.    Defendants review claims according to unknown, undefined standards. The government provides no rubric, manual, or set of guidelines or standards that are used to decide

---

[20] *See* https://www.hrsa.gov/cicp/filing-process ("Submission Instructions" state: Send your request for benefits by U.S. Postal Service mail or private courier service (e.g., FedEx or UPS) to the address below:

U.S. Department of Health and Human Services
Health Resources and Services Administration
Countermeasures Injury Compensation Program
5600 Fishers Lane, Room 8W-25A
Rockville, MD 20857.

requests. Instead, the government states that, "To establish a covered injury, the CICP must determine that the injury sustained was the direct result of the administration or use of a covered countermeasure. Under the Public Readiness and Emergency Preparedness Act (PREP Act), the CICP may only make such determinations based on compelling, reliable, valid, medical, and scientific evidence." [21] This standard appears to be determined by unidentified individuals, based on unidentified information and evidence.

110.    The government does not identify any expert witnesses or consultants used in making determinations. If the government relies on such experts or consultants, the government does not produce their written reports or materials or allow Plaintiffs the opportunity to question or cross-examine the experts. If the government does not rely upon experts, that presents other obvious concerns regarding the CICP process.

111.    Plaintiffs cannot present their own expert or fact witnesses.

112.    If denied benefits, Plaintiffs may request reconsideration from HHS within 60 days by mail (to the same address to which the original Request for Benefits was submitted).[22] The same issues detailed above pertain to this "appeals" process and the same questions remain unanswered: who is deciding the request for reconsideration, what is the timeline, what is the standard of review?

113.    Almost nothing else is disclosed about the inner workings of CICP.

---

[21] https://www.hrsa.gov/cicp/criteria-demonstrate-covered-injury-occurred.

[22] https://www.hrsa.gov/cicp/faq (see question "What if the CICP determines that I am not eligible for benefits?").

## I.        Lack of CICP Funding

114.    In addition to the complete lack of transparency about the program, CICP is also grossly underfunded. According to HRSA's operating plan, HRSA budgeted $5 million and $7 million for "administration" of CICP in 2022 and 2023, respectively,[23] although hundreds of millions of doses of COVID-19 vaccines were administered.

115.    CICP lacks cost-effectiveness and efficiency, with 94% of its total costs spent on administration rather than compensation to Plaintiffs and others. *See* J. Zhao, et al, *Reforming the countermeasures injury compensation program for COVID-19 and beyond: An economic perspective*, DUKE J. OF LAW & THE BIOSCIENCES, p. 2 (2022).

116.    CICP appears unable to adequately compensate — further evidence that the program is simply theatre. If COVID-19 claims were compensated at CICP's historical rate, CICP would face around $21.16 million in compensation outlays and $317.94 million in total outlays which is 72.1 times its current balance. *Id.*

## J.        Lack of Judicial Review

117.    As described above, individuals harmed by a covered countermeasure like the COVID-19 vaccine cannot obtain judicial review of CICP determinations. *See* 42 U.S.C. § 247d-6e(d) (discussing exhaustion requirement and limited appeal rights).

118.    Thus, CICP fundamentally differs from other compensation schemes such as the National Childhood Vaccine Injury Act of 1986 ("**Vaccine Act**"), which is subject to judicial

---

[23] HRSA, *FY 2023 Operating Plan*, available at: https://www.hrsa.gov/about/budget/operating-plan.

oversight pursuant to specialized rules before the United States Court of Federal Claims ("**Vaccine Court**").[24]

### K.      Lack of COVID-19 Vaccine Injury Table

119.     Although the HHS Secretary is authorized to create a CICP COVID-19 injury table, he has not done so despite the passage of nearly three years after the widespread administration of the COVID-19 vaccine and the submission of 12,700 CICP claims and 1,683,039 reports made to VAERS to date following any COVID-19 vaccine.[25]

120.     According to the government, "An injury meeting the requirements of a covered countermeasures injury table [] **is presumed** to be the direct result of the administration or use of a covered countermeasure unless the Secretary determines there is another more likely cause."[26] Therefore, satisfying the necessary element of proving one has a covered injury is a lower standard for table injuries.

121.     Because the Secretary has failed to create a COVID-19 vaccine injury table, Plaintiffs and all those requesting benefits from CICP need to meet the higher burden of proving the injury is a direct result of the administration of a COVID-19 vaccine.

---

[24] Even the Vaccine Act's (which does permit judicial review) flaws have been well documented. *See* "The Vaccine Injury Compensation Program: Addressing Needs and Improving Practices" (6th Rep. 2000), available at: https://www.congress.gov/106/crpt/hrpt977/CRPT-106hrpt977.pdf.

[25] https://wonder.cdc.gov/vaers.html (reflecting 1,683,039 events reported from COVID-19 vaccines as of November 24, 2023); *see also* https://medalerts.org/vaersdb/findfield.php?TABLE=ON&GROUP1=VAX &EVENTS=ON&VAX%5b%5d=COVID19&VAX%5b%5d=COVID19-2&VAXTYPES=COVID-19 (utilizing government's raw data but allowing users to save and send hyperlinks to searches and reflecting 1,683,039 events reported from COVID-19 vaccines).

[26] https://www.hrsa.gov/cicp/criteria-demonstrate-covered-injury-occurred (emphasis added).

**L.      Summary of Plaintiffs' Experiences with CICP Bring the Program's Issues into Sharp Focus**

122.     In March 2022, Carolina made a claim with the CICP. Almost a year later, CICP representatives continued to claim that they did not have any of her records. More than a year and a half after submitting her claim, Carolina has received no determination or updates from CICP.

123.     Emma submitted a claim to CICP over two years ago, in November 2021. In the most recent call, CICP representatives provided no timeline for deciding her claim, stating repeatedly and coldly that it would be a "hot minute" until any decision was made.

124.     On April 25, 2021, Cody submitted his Request for Benefits form to CICP. Over a year later, after dozens of follow-ups by Cody, and after United States Senator Cindy Hyde-Smith contacted the CICP multiple times,[27] Cody's request was denied on May 25, 2022. On June 15, 2022, pursuant to CICP processes, Cody requested reconsideration of the denial of benefits. CICP denied Cody's request for reconsideration on January 18, 2023.

125.     On October 1, 2021, after spending weeks compiling it, Michelle submitted a Request for Benefits form to CICP through the electronic portal. Michelle received online confirmation that her application and medical records were received in October 2021. Michelle repeatedly requested updates from CICP officials and confirmation that her medical records had been received. For over two years, CICP officials have delayed, providing contradictory answers without any indication that resolution of Michelle's claim is forthcoming. Over two years later, there is no indication when a determination will be made on Michelle's claim.

---

[27] "Senator Hyde-Smith Cites Mississippi Case in Questioning HHS Injury Compensation Program," available at: https://www.youtube.com/watch?v=YGAhSLqFV9A (accessed December 10, 2023).

126.    In September 2021, Jessica submitted an online request for benefits to CICP. Jessica also submitted a CICP claim with supporting documentation for her daughter before the one-year deadline in September 2022. To date, she has not received a response to either request.

127.    CICP operates entirely off the record and tramples on Plaintiffs' constitutional rights. The Court should strike down the PREP Act to the extent it fails to provide basic due process protections, transparency, and judicial oversight.

## COUNT I

## DECLARATORY JUDGMENT

128.    Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

129.    Plaintiffs are entitled to a declaratory judgment pursuant to 28 U.S.C. § 2201 that the PREP Act provisions which create the scheme providing liability protection and a compensation process for COVID-19 vaccines, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, violate the Fifth and Seventh Amendments for deprivation of federal constitutional rights.

130.    An actual and substantial controversy exists between Plaintiffs and Defendants as to their legal rights and duties with respect to whether the PREP Act provisions which create the scheme providing liability protection and a compensation process for COVID-19 vaccines, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, violate the United States Constitution.

131.    The case is presently justiciable because CICP's constitutional deficiencies apply to Plaintiffs, who are currently harmed by the CICP.

132.    Absent the PREP Act, Plaintiffs could bring tort claims against vaccine manufacturers, distributors, administrators, and others who may be liable for their injuries under

36

state law. However, Plaintiffs are foreclosed from bringing such claims because the PREP Act,

including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, provides liability protection and

purports to establish a separate compensation process for COVID-19 vaccines. The PREP Act is

unconstitutional. Plaintiffs are injured by this unconstitutional statute because they are barred from

bringing claims that would otherwise exist under state law and no adequate remedy has been

offered in the alternative.

133.    Declaratory relief is therefore appropriate to resolve this controversy.

## COUNT II

## DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT – PROCEDURAL DUE PROCESS VIOLATION

134.    Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

135.    The Fifth Amendment provides that no person shall "be deprived of life, liberty, or

property, without due process of law." U.S. Const. amend. V. Plaintiffs bring a claim under the

Due Process Clause of the Fifth Amendment.

### A.    Plaintiffs' Liberty or Property Interests at Stake

136.    CICP implicates recognized liberty and property interests. The government

extinguished Plaintiffs' common law tort claims and replaced them with a federalized claim

requiring proof of causation – a claim that has no discernible value.

137.    First, the Supreme Court has long recognized that a cause of action is a species of

property protected by the Due Process Clause. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422,

428 (1982); *see also Tulsa Prof'l Collection Serv. v. Pope,* 485 U.S. 478, 485 (1988) (holding that

"little doubt remains" that a cause of action is a Constitutionally protected property interest);

*Blackmon v. Am. Home Prods. Corp.*, 328 F. Supp. 2d 647, 656 (S.D. Tex. 2004) (recognizing that

a claim brought under the Vaccine Act "is a property interest protected by the Due Process Clause" (citing *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306 (1950)); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985); *Duke Power Co. v. Carolina Envtl. Study Grp.*, 438 U.S. 59, 94 (1978) (stating that the Price-Anderson Act's elimination of common law-based tort claims was a recognized property right and that the "Act impinges on that right by limiting recovery in major accidents" (Stewart, J., concurring)).

138.   Second, to the extent the PREP Act provides a right to relief for Plaintiffs and others injured by COVID-19 vaccines, Plaintiffs have a liberty or property interest in seeking proper relief for their injuries. *See, e.g., Axon Enter. v. FTC*, 143 S.Ct. 890, 909 n.5 (2023) (Thomas, J., concurring) (discussing Supreme Court precedent equating government entitlements with core private rights); *see also Arthritis & Osteoporosis Clinic of E. Tex., P.A. v. Azar*, 450 F.Supp.3d 740, 747 (E.D. Tex. 2020) (granting preliminary injunction on plaintiff's due process claim where government failed to provide timely review of alleged overpayment of Medicare payments).

139.   Third, a person has a liberty interest in pursuing an occupation. *See Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983). Plaintiffs have been severely harmed and limited in their abilities to pursue their occupations due to COVID-19 vaccine injuries.

140.   Fourth, liberty interests are also implicated by the PREP Act because it preempts the standard informed consent requirements under state common law and then, for all intents and purposes, eliminates informed consent at the federal level. As a result, 270 million Americans were injected with vaccines without informed consent; in fact, the government fought to hard to ensure information necessary for citizens to make informed healthcare decisions would be hidden for 75 years. *See Pub. Health & Med. Pros. for Transparency v. FDA*, No. 4:21-cv-1058-P, 2022 U.S. Dist. LEXIS 5621 (N.D. Tex. Jan. 6, 2022). This implicates recognized liberty interests. *See*

*Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269 (1990) (holding that the right to refuse life-saving medical treatment is a liberty interest protected by the Fifth Amendment on grounds that the right to die is a "logical corollary of the doctrine of informed consent," a doctrine that "has become firmly entrenched" in the American legal system, and reasoning that every "human being of adult years and sound mind has a right to determine what shall be done with his own body").

### B.    The Supreme Court's Procedural Due Process Test

141.    The United States Supreme Court has considered three factors to determine whether government action satisfies procedural due process requirements:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 239 (5th Cir. 2012) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

142.    Each of the three *Mathews v. Eldridge* factors considered by the Supreme Court favors striking down the PREP Act to the extent it violates fundamental procedural due process protections.

### C.    Plaintiffs' Private Interests

143.    <u>First</u>, Plaintiffs' private interests in this case are substantial. Plaintiffs' sole remedy for their injuries is through CICP. The PREP Act, in part via CICP, in its current form, generally immunizes vaccine manufacturers and distributors from harms caused by their products. In most cases, Plaintiffs and other claimants would have no recourse for their injuries other than CICP without the relief requested herein.

144.     But for the PREP Act, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, Plaintiffs could bring tort claims against vaccine manufacturers, distributors, administrators, and others who may be liable for their injuries under state law. However, Plaintiffs are foreclosed by the PREP Act from bringing such claims.

**D.     CICP's Established Record of Erroneous Deprivation and Value of Additional Safeguards**

145.     <u>Second</u>, CICP provides a clear risk of erroneous deprivation by operating as a modern-day "star chamber" in which unidentified individuals review claims, under the alleged review of an unidentified panel. *See, e.g.*, *Schultz v. Medina Valley Indep. Sch. Dist.*, 2011 U.S. Distr. 140330, W.D. Tex. (Dec. 6, 2011) (noting that early Americans came to the United States to escape England's "star chamber of secret trials") (citing JOHN SOUTHERDEN BURN, THE STAR CHAMBER (2008)).

146.     Thus, CICP fails to provide notice and an opportunity to be heard at a meaningful time and in a meaningful manner. Only Defendants have access to each and every detail concerning CICP. However, Plaintiffs have identified myriad flaws, which taken together, demonstrate the government's disregard of basic due process protections. Perhaps each of these issues in isolation would not render CICP as violative of procedural due process, yet when taken together (as they must be), that line is plainly crossed:

- Defendants hold no hearings, operate CICP entirely off the record, and provide Plaintiffs no reasonable opportunity to be heard before a decision is made;
- Defendants do not disclose the name, title, and educational credentials of the individuals who are deciding COVID-19 vaccine injury claims;
- Defendants do not disclose whether decision-makers have conflicts of interest or provide a process for Plaintiffs to challenge any decision-maker for conflicts of interest;
- Defendants fail to identify any expert witnesses or consultants used by the government in making CICP determinations;
- Defendants provide no reasonable opportunity for Plaintiffs to question witnesses, including experts, or review evidence used against claimants;

- Defendants provide no reasonable opportunity for Plaintiffs to question or obtain discovery from government experts, including producing copies of any expert reports;
- Defendants provide no reasonable opportunity for Plaintiffs to present expert witnesses on their behalf;
- Defendants provide no reasonable opportunity for Plaintiffs to obtain discovery, including discovery from companies that manufactured or distributed the COVID-19 vaccines that harmed them;
- Defendants do not produce copies of any records or documents used to decide COVID-19 vaccine injury claims;
- CICP's one-year statute of limitations is procedurally unfair given the fact that symptoms of COVID-19 vaccine injuries continue to progress beyond that period and research continues concerning the long-term side effects of these novel medical treatments;
- CICP fails to preserve the right of Plaintiffs and other claimants to present claims for damages in court, before a civil jury, if they elect to do so;
- CICP fails to allow claimants to seek reasonable recovery for all damages suffered, including related to medical treatment, loss of income or earning potential, death, and/or pain, suffering, and emotional distress;
- CICP provides no opportunity for an appeal or judicial review of a COVID-19 vaccine injury decision in a court of law;
- CICP operates under no time limits and many Plaintiffs continue to wait for a determination more than two years after submission of the Request for Benefits; and
- Defendants maintain no written record of any hearings or proceedings for judicial review.

147.    Plaintiffs request that the Court declare that CICP is unconstitutional under the due process clause of the Fifth Amendment because the program fails to provide the basic due process protections listed above. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (considering "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards").

### E.    Government's Interest

148.    <u>Third</u>, the government should have an interest in ensuring that CICP functions to compensate those injured by COVID-19 vaccines. In considering this factor, courts consider,

among other things, "the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335.

149.    Here, the protections requested by Plaintiffs impose no greater fiscal and administrative burdens on the government than already exist under the Vaccine Act. The Vaccine Act is already subject to judicial review and courts require that the government afford claimants minimal due process protections. *See, e.g.*, *Richardson v. Sec'y of HHS*, 89 Fed. Cl. 657 (2009) (determining that a special master's procedures failed to satisfy fundamental due process requirements).

150.    Moreover, if this court declares the relevant provisions of the PREP Act unconstitutional, this would potentially decrease the number of CICP claims and decrease the administrative burden on Defendants. Claimants could presumably pursue relief, in a court of competent jurisdiction, from those who manufactured, distributed, and/or administered the COVID-19 vaccines. In the alternative, the government could provide the needed safeguards, bringing the compensation program in line with the Constitution, as it has in Vaccine Court pursuant to the Vaccine Act.

### F.    Supreme Court Precedent Regarding Compensation Programs

151.    The Supreme Court has upheld legislative programs that modify common law rights and provide alternative compensation schemes. *See, e.g.*, *New York Central Railroad Co. v. White*, 243 U.S. 188, 202 (1917) (stating that the no-fault worker's compensation system was a "just settlement" of the problem the legislature sought to address); *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 88 (1978) (stating that the Price-Anderson Act provided a "reasonably just substitute" for common-law or state law remedies for injuries related to nuclear accidents).

42

152.    However, legislative bodies do not possess limitless power to abrogate common-law rights:

> I do not understand the Court to suggest that rights of property are to be defined solely by state law, or that there is no federal constitutional barrier to the abrogation of common-law rights by Congress or a state government. The constitutional terms "life, liberty, and property" do not derive their meaning solely from the provisions of positive law. They have a normative dimension as well, establishing a sphere of private autonomy which government is bound to respect. Quite serious constitutional questions might be raised if a legislature attempted to abolish certain categories of common-law rights in some general way. Indeed, our cases demonstrate that there are limits on governmental authority to abolish "core" common-law rights, including rights against trespass, at least without a compelling showing of necessity or a provision for a reasonable alternative remedy.

*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 93 (1980) (Marshall, J., concurring); *see also Fein v. Permanente Medical Group*, 474 U.S. 892, 894-895 (1985) (White, J., dissenting) ("Whether due process requires a legislatively enacted compensation scheme to be a quid pro quo for the common-law or state-law remedy it replaces, and if so, how adequate it must be, thus appears to be an issue unresolved by this Court, and one which is dividing the appellate and highest courts of several States.").

153.    By prohibiting judicial relief except in certain extremely limited circumstances (none of which are available to Plaintiffs), the PREP Act has extinguished Plaintiffs' tort causes of action under state law and has instead implemented a convoluted, underfunded, and opaque process that is wholly inadequate for Plaintiffs to seek compensation for their injuries. Thus, the government has failed to provide a "reasonably just substitute" or "reasonable alternative remedy" for taking Plaintiffs' state or common-law rights to recover damages for their injuries.

154.     CICP, established by the PREP Act, violates Plaintiffs' rights under the Fifth

Amendment by eliminating rights that otherwise exist under state law and instead directs Plaintiffs'

claims through CICP, which fails to provide essential due process protections.

155.     Accordingly, CICP directly and proximately deprives Plaintiffs of their procedural

due process rights under the Fifth Amendment. CICP is unconstitutional on its face and as applied

to Plaintiffs, and Plaintiffs are entitled to a declaratory judgment and the issuance of an injunction.

## COUNT III

## DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT – SUBSTANTIVE DUE PROCESS VIOLATION

156.     Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

157.     The Due Process Clause guarantees more than fair process; it also includes a

substantive component that "provides heightened protection against government interference with

certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000)

(quotation marks omitted). The right to pursue redress for injuries or wrongs is a bedrock principle

of America's legal system. In some circumstances, the Supreme Court has upheld legislation that

modifies or abrogates a common law right to a tort claim, provided that the legislature has replaced

the extinguished right with a just and reasonable substitute. *See, e.g.*, *Duke Power*, 438 U.S. at 88

(stating that the Price-Anderson Act provided a "reasonably just substitute" for common-law or

state law remedies for injuries related to nuclear accidents); *New York Central Railroad Co. v.*

*White*, 243 U.S. 188, 202 (1917) (holding that New York's no-fault worker's compensation system

was a "just settlement" for the common law tort claim the system modified).

A.      **Failure to Provide a Reasonably Just Substitute**

158.    Each Plaintiff suffered severe and significant injuries believed to be caused by one or more doses of the COVID-19 vaccine. But for the PREP Act, Plaintiffs would be entitled to seek relief for their injuries in a court of competent jurisdiction. They would be entitled to, *inter alia*, assert their claims, request discovery, and if necessary, proceed to a trial before a jury of their peers.

159.    The PREP Act extinguishes Plaintiffs' rights that otherwise exist under state law without providing a reasonably just substitute or reasonable alternative remedy. Many states provide a constitutional right to an alternative remedy under these circumstances. Where state legislatures interfere with a common law right, even modifications to common law causes of action are regularly struck down in state courts where a fair alternative is not supplied. *See, e.g.*, *Mello v. Big Y Foods, Inc.*, 826 A.2d 1117, 1124-25 (Conn. 2003) ("It is settled law that [the Connecticut Constitution] restricts the power of the legislature to abolish a legal right existing at common law prior to 1818 without also establishing a reasonable alternative to the enforcement of that right"); *Tillman v. Goodpasture*, 485 P.3d 656, 667 (Kan. 2021) (observing that, while the legislature can modify the common law right, it must provide "an adequate substitute remedy for the right infringed or abolished"); *Busch v. McInnis Waste Sys.*, 468 P.3d 419 (Or. 2020) (holding statutory damages cap unconstitutional under Oregon Constitution and, therefore, void); *Waite v. Utah Labor Comm'n*, 416 P.3d 635, 642 (Utah 2017) (holding Utah's Constitution requires "an effective and reasonable alternative remedy" where a common law right is abrogated). *See also Fein v. Permanente Med. Group*, 474 U.S. 892, 893-95 (1985) (White, J., dissenting from dismissal of appeal) (observing the open question whether due process forbids states from enacting damage caps without providing a quid pro quo to persons whose claims are capped).

45

160.    The PREP Act is entirely unlike the replacement schemes affirmed by the United States Supreme Court in *Duke Power* and *White*. Those cases involved a federal law and a state law, both of which created systems that were: (i) adequately funded, and (ii) incentivized responsible behavior. In *Duke Power*, the federal statute set a cap of $560 million in damages per incident, the majority of which would be paid by the party responsible for the injuries through direct payments or insurance premiums. 438 U.S. at 66. In *White*, New York's worker's compensation program guaranteed claim payments would be funded through "premiums received from employers." 243 U.S. at 194.

161.    Here, the opposite is true. CICP is severely underfunded and rife with perverse incentives. CICP's 97.9% denial rate and *de minimis* compensation show that, in effect, CICP extinguishes Plaintiffs' legal claims for their injuries in exchange for no compensation.

162.    The average payout for the 10 approved COVID-19 vaccine CICP claims is $3,694.50, and approximately 0.08% of claimants filing CICP claims related to COVID-19 countermeasures have received compensation. Compl. ¶ 99. This result is no surprise given HRSA's paltry 2023 budget of $7 million dollars. *Id.* ¶ 114. Because of the number of claims filed, there is simply no way those harmed by a COVID-19 vaccine could ever receive fair redress for the harms caused. If the current 12,700 claimants were all paid from the $7 million dollars, each would be able to receive a maximum of $551.18. And what little funds are allocated to CICP are extracted from the public, providing no deterrent for risky and socially destructive behaviors by the actors who caused the harms.

## B.    Unconscionable One-Year Statute of Limitations

163.    "[T]he touchstone of due process is protection of the individual against arbitrary actions of government, whether the fault lies in a denial of fundamental procedural fairness, or in

46

the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (internal quotations and citations omitted). Substantive due process prevents the government from engaging in conduct the "shocks the conscience" or interferes with rights "implicit in the concept of ordered liberty." *U.S. v. Salerno*, 481 U.S. 739, 746 (1987) (quotations omitted).

164.    CICP's strict one-year statute of limitations from the date of injection (with no discovery rule) is substantively unfair and serves to eliminate the tort claims of many Americans who suffered life-altering injuries, including those whose symptoms manifested outside the one-year limitation period, or those who were unaware of CICP, in part, because the government suppressed information about vaccine injuries. *See Missouri v. Biden*, 80 F.4th 641 (5th Cir. 2023) (holding that the government violated the First Amendment freedoms of citizens through, inter alia, censoring viewpoints on social media platforms, including censorship of those who attempted to raise awareness of adverse side-effects of COVID-19 vaccines). Thus, the federal government censored information regarding COVID-19 vaccine injuries while Defendants simultaneously enforce a one-year statute of limitations to file CICP claims.

165.    A statute of limitations cannot be so brief that it serves to "bar the existing rights of claimants without affording [the opportunity to assert the right in court]; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily." *Wilson v. Iseminger*, 185 U.S. 55, 62 (1902); *see also Reynolds v. Porter*, 760 P.2d 816 (Okla. 1988) (striking legislative modification to statute of limitations that lacked discovery rule provision as unconstitutional under the Oklahoma Constitution). FDA licensed the Pfizer vaccine in just 108 days. Troubling safety data was then concealed from the public. As such, there is absolutely no way for the population and those injured to fully comprehend the long-term risks

and adverse side effects of the vaccines, or for scientists and medical practitioners to adequately develop therapies and treatments for the vaccine-injured within one year. *See Duke Power*, 438 U.S. at 88 (upholding Price-Anderson Act, which effectively institutes a three-year statute of limitations from the date on which the claimant first knew, or reasonably could have known, of his injury or damage, and a limitations period that potentially extends to ten years after nuclear incidents).

166.   CICP falls woefully short of the PREP Act's stated objective of providing "timely, uniform, and adequate compensation" to individuals injured by covered countermeasures. 45 U.S.C. § 247d-6e(a).

167.   CICP fails to provide a "reasonably just substitute" or "reasonable alternative remedy" for taking Plaintiffs' state or common-law rights to recover damages for their injuries. Simply, CICP offers no quid pro quo to Plaintiffs or any others subject to its limitations. CICP strips Plaintiffs of their fundamental right to pursue relief for injuries under state law and, specifically, the right to have their claims for damages heard by a jury of their peers.

168.   CICP is unconstitutional on its face and as applied to Plaintiffs, and Plaintiffs are entitled to a declaratory judgment and the issuance of an injunction.

## COUNT IV

## SEVENTH AMENDMENT – VIOLATION OF RIGHT TO A JURY TRIAL

169.   Plaintiffs reincorporate the preceding paragraphs as if fully written herein.

170.   The Seventh Amendment guarantees that, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII.

171.    The Seventh Amendment applies "to actions enforcing statutory rights, and requires a jury trial upon demand, if the statute creates legal rights and remedies, enforceable in an action for damages in the ordinary courts of law." *Curtis v. Loether*, 415 U.S. 189, 194 (1974). "In a just sense, the [Seventh] amendment then may well be construed to embrace all suits which are not of equity and admiralty jurisdiction, whatever may be the peculiar form which they may assume to settle legal rights." *Parsons v. Bedford*, 28 U.S. 433, 447 (1830).

### A.    Constitutional Limits on Restricting Jury-Trial Rights

172.    "Congress cannot circumvent the Seventh Amendment jury-trial right simply by passing a statute that assigns 'traditional legal claims' to an administrative tribunal." *Jarkesy, et al. v. SEC*, 34 F.4th 446, 453 (4th Cir. 2022) (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989)), *cert. granted*, 143 S. Ct. 2688 (Jun. 30, 2023). Federal laws permitting administrative agencies, rather than Article III judges, to adjudicate "core private rights" present "serious constitutional issues." *Axon Enter. v. FTC*, 143 S.Ct. 890, 911 (2023) (Thomas, J., concurring) (discussing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. at 61)).

173.    "Whether Congress may properly assign an action to administrative adjudication depends on whether the proceedings center on 'public rights.'" *Jarkesy*, 34 F.4th at 453 (quoting *Atlas Roofing Co. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 455 (1977)). The Supreme Court has held that in "public rights" cases – *i.e.*, cases where "the Government sues in its sovereign capacity to enforce public rights created by statutes within the power of Congress to enact" – the Seventh Amendment does not bar Congress from assigning the factfinding function and initial adjudication to an administrative forum without a jury. *Id.* Public rights arise "when Congress passes a statute under its constitutional authority that creates a right so closely integrated with a comprehensive regulatory scheme that the right is appropriate for agency resolution."

49

*Jarkesy,* 34 F.4th at 453 (citing *Granfinanciera, S.A. v. Nordberg*, 492 U.S. at 54). The Fifth Circuit

has described the proper analysis as follows:

> The analysis… moves in two stages. First, a court must determine
> whether an action's claims arise "at common law" under the Seventh
> Amendment. Second, if the action involves common-law claims, a
> court must determine whether the Supreme Court's public-rights
> cases nonetheless permit Congress to assign it to agency
> adjudication without a jury trial. Here, the relevant considerations
> include: (1) whether Congress created a new cause of action, and
> remedies therefor, unknown to the common law, because traditional
> rights and remedies were inadequate to cope with a manifest public
> problem; and (2) whether jury trials would go far to dismantle the
> statutory scheme or impede swift resolution of the claims created by
> statute.

*Id.* at 453 (internal quotations and citations omitted).

### B.    Plaintiffs' Claims Arise at Common Law Under the Seventh Amendment

174.    Plaintiffs' claims arise "at common law" for purposes of the Seventh Amendment.

175.    Negligence was a legal claim at common law that existed when the Seventh

Amendment was adopted. The "origin of negligence cases dates back as early as the fifteenth

century." Peter A. Arhangelsky, *Nullifying the Constitution: Federal Asbestos Tort Reform and

the Abrogation of Seventh Amendment Rights*, 40 Suff. U. L.Rev. 95, 114 (2006). "When the

Seventh Amendment was enacted in 1791, personal injury cases sounding in negligence were

ubiquitous in the English court system." *Id.* Juries decided these early negligence cases. *See* Patrick

J. Kelley, *Symposium, Restating Duty Breach, and Proximate Cause in Negligence Law:

Descriptive Theory and the Rule of Law*, 54 Vand. L. Rev. 1039, 1057 (2001) (arguing that the

early preference for jury trials was instrumental in shaping modern tort law).

176.    Plaintiffs allege that they have suffered significant injuries from COVID-19

vaccines. But for the immunity provisions established under the PREP Act and the creation of

CICP, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, each Plaintiff could seek

recovery of monetary damages for, among other things, physical injuries and loss of income or earning potential.

### C.    Congress May Not Assign Plaintiffs' Claims for Agency Determination

177.    CICP displaces Plaintiffs' legal rights to litigate core private rights for negligence and claims for other injuries — rights that should be heard by a jury under the Seventh Amendment. Thus, the government is not merely conferring a benefit. The government is replacing a legal right for monetary damages with a purported benefit under CICP.

178.    Congress lacks authority to assign Plaintiffs' claims for agency determination, without judicial review or right to a jury trial. To the extent the Court determines that the PREP Act creates "public rights" under the Seventh Amendment precedent, Plaintiffs are nonetheless entitled to a jury trial.

179.    As the Fifth Circuit noted in *Jarkesy*, the relevant considerations include: "(1) whether Congress created a new cause of action, and remedies therefor, unknown to the common law, because traditional rights and remedies were inadequate to cope with a manifest public problem; and (2) whether jury trials would go far to dismantle the statutory scheme or impede swift resolution of the claims created by statute." *Jarkesy,* 34 F.4th at 453 (internal quotations and citations omitted).

### D.    Claims Sounding in Negligence Pre-Date the Seventh Amendment

180.    As demonstrated above, Plaintiffs' claims sound in negligence and are, therefore, the types of legal claims which have existed for centuries.

181.    The claims in *Jarkesy* sounded in fraud, and fraud prosecutions "were regularly brought in English courts at common law." *Id.* at 453. Indeed, "[c]ommon-law courts have heard fraud actions for centuries, even actions brought by the government for fines." *Id.* at 454.

182.    The same analysis applies here, where Plaintiffs assert claims sounding in negligence and related tort claims. As discussed above, negligence claims pre-date the ratification of the Seventh Amendment.

### E.    Striking Down Immunity Provisions Would Not Dismantle a Viable Compensation Scheme

183.    Furthermore, as the record demonstrates, CICP provides no real compensation scheme that would be dismantled by striking down the relevant provisions of the PREP Act. Unlike the compensation schemes in *Duke Power* and *White*, CICP provides no viable avenue for Plaintiffs and others to obtain relief.

184.    Thus, declaring the provisions of the PREP Act which create the scheme providing liability protection and a compensation process for COVID-19 vaccines, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, to be unconstitutional under the Seventh Amendment would not interfere with any carefully-crafted federal compensation scheme.

### F.    Striking Down Immunity Provisions Would Not Impede Swift Resolution of Claims

185.    Protecting Plaintiffs' jury-trial rights under the Seventh Amendment would not impede swift resolution of the claims provided by statute. *See Jarkesy,* 34 F.4th at 453. Indeed, the CICP process, in its current form, is inefficient, ineffective, and fails to provide timely relief to claimants.

186.    If the Court grants the requested relief, claimants would presumably bring claims against vaccine manufacturers, distributors, and/or administrators in courts of competent jurisdiction. CICP administrators have shown they are either unwilling or unable to administer an effective compensation scheme.

52

187.    State and federal courts are far better equipped to hear cases and controversies filed by injured claimants, while preserving the fundamental right to a jury trial under the Seventh Amendment.

188.    CICP violates Plaintiffs' Seventh Amendment rights because it denies their right to a trial by jury. Accordingly, CICP directly and proximately deprives Plaintiffs of their federally protected Seventh Amendment right to a trial by jury as stated above.

189.    CICP is unconstitutional on its face and as applied to Plaintiffs; therefore, Plaintiffs are entitled to a declaratory judgment and the issuance of an injunction.

## PRAYER FOR RELIEF

1.    **DECLARE** that the provisions of the PREP Act which create the scheme providing liability protection and a compensation process for COVID-19 vaccines, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, are unconstitutional under the Fifth and Seventh Amendments both on their face and as applied to Plaintiffs;

2.    **ENJOIN,** Defendants, their agents, servants, employees, and any other persons acting on their behalf, from enforcing those provisions of the PREP Act which create the scheme providing liability protection and a compensation process for COVID-19 vaccines, including but not limited to 42 U.S.C. §§ 247d-6d and 247d-6e, unless the federal government reforms CICP to come into compliance with Constitutional requirements, including *inter alia* the minimal due process requirements and protections listed in paragraph 13 above; and

3.    **AWARD** Plaintiffs their costs and attorneys' fees under 28 U.S.C. § 2412 and any other applicable authority, and any other such relief this Court deems just and proper.

Dated: December 21, 2023                     Respectfully submitted,


/s/ Charlotte Y. Bergeron                    /s/ Aaron Siri
Charlotte Y. Bergeron, Esq.                  Aaron Siri, Esq.* [Trial Attorney]
Louisiana Bar Number: 24293                  New York Bar Number: 4321790
1040 Audubon Street                          Elizabeth A. Brehm, Esq.*
Lake Charles, LA 70605                       New York Bar Number: 4660353
Tel: (225) 229-7135                          Kevin Mitchell, Esq.*
cbergeronlaw@gmail.com                       Michigan Bar Number: P84639
                                             Catherine Cline, Esq.*
                                             Florida Bar Number: 125955
                                             SIRI & GLIMSTAD LLP
                                             745 Fifth Ave, Suite 500
                                             New York, NY 10151
                                             Tel: (212) 532-1091
                                             Fax: (646) 417-5967
                                             aaron@sirillp.com
                                             ebrehm@sirillp.com
                                             kmitchell@sirillp.com
                                             ccline@sirillp.com

                                             /s/ Walker D. Moller
                                             Walker D. Moller, Esq.*
                                             Texas Bar Number: 24092851
                                             SIRI & GLIMSTAD LLP
                                             1005 Congress Avenue
                                             Suite 925-C36
                                             Austin, TX 78701
                                             Tel: (512) 265-5622
                                             Fax: (646) 417-5967
                                             wmoller@sirillp.com


*Attorneys for Plaintiffs*
*Admitted pro vac vice.*

54

## <u>VERIFICATION</u>

I, Carolina Bourque, a citizen of the United States and of the state of Louisiana, have read the foregoing Second Amended Verified Compliant and know the contents thereof as to myself in paragraphs 3, 16, 24-35, and 122 that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ____12 / 21 / 2023_____ in Youngsville, Louisiana.

_____
Carolina Bourque

Doc ID: 2b40d20f2abb2c6c551a30fb847a771d935705f5

**<u>VERIFICATION</u>**

I, Emma Burkey, a citizen of the United States and of the state of Nevada, have read the foregoing Second Amended Verified Compliant and know the contents thereof as to myself in paragraphs 4, 17, 36-54 and 123 that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___12 / 21 / 2023_____ in Henderson, Nevada.

_Emma Burkey_
_____
Emma Burkey

## **VERIFICATION**

I, Christopher Cody Flint, a citizen of the United States and of the state of Mississippi, have read the foregoing Second Amended Verified Compliant and know the contents thereof as to myself in paragraphs 5, 18, 55-64 and 124 that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___12 / 21 / 2023_____ in Cleveland, Mississippi.

_____
Christopher Cody Flint

## **VERIFICATION**

I, Jessica Krogmeier, a citizen of the United States and of the state of Iowa, have read the foregoing Second Amended Verified Compliant and know the contents thereof as to myself in paragraphs 7, 20, 80-93 and 156 that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___12 / 21 / 2023_____ in Donnellson, Iowa.

_____
Jessica Krogmeier

## **VERIFICATION**

I, Michelle Zimmerman, a citizen of the United States and of the state of Washington, have read the foregoing Second Amended Verified Compliant and know the contents thereof as to myself in paragraphs 6, 19, 65-79 and 125 that the same is true to my own knowledge and as to all other matters on information and belief and I believe them to be true.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on ___12 / 21 / 2023___ in Seattle, Washington.

_____
Michelle Zimmerman